Statement of the Case.
NICHOLLS, C. J.
The plaintiffs averred themselves, together with the defendant, to be the seven children and sole forced heirs and representatives under benefit of inventory of Hypolite Barras and his wife, Clemence Barras, residents of the parish of St. Martin. That their mother died in 1893, and their father in 1902. That their mother’s succession was opened in July, 1893. That only a portion of the property of the estate was inventoried, being part of the community which existed between her and her husband. That a partial partition of said community property was made between the father and these heirs of their mother on the 11th of November, 1893. That the stock-cattle and mules—in the parish of St. Martin were not then partitioned on account of the representation made to the latter that there was an indebtedness of $1,000 due by the community. That they authorized the defondant, Auguste Barras, to sell enough of the cattle to realize that sum and pay off the same. That under this authorization he did make such sale, but that he had persistently refused to make any statement showing the disbursements, if any, made by him towards settling said indebtedness, the nature of which had not been explained to them.
That after said sale there remained in the possession and charge of the defendant 150 head of cattle, of the value of $18 a head, aggregating the sum of $2,700, belonging jointly to the extent of one-half to defendant and themselves; the property being the property of their father and mother. That defendant had either disposed of or still held the said 150 head of cattle without rendering any account thereof to petitioners, who had in vain demanded the same. That in view of the said premises defendant was indebted to them in the amount of $482, being the six-sevenths of the half of $1,000, the amount realized by defendant from the sale which was made by him of the cattle in order to meet the indebtedness of the community to that amount, and the further sum of $1,157, being the six-sevenths of the one-half of $2,700 the value of the cattle still held by him, or which had been disposed of by him, and which was the common property of him and themselves as heirs of their mother. They further alleged that on the 11th of October, 1895, their father, Hypolite Barras, signed a deed of transfer to his son, the defendant, for an alleged cash consideration of $3,469, of all of his property, effects, and belongings. They averred that this alleged transfer was not a real sale, but a simulated transaction, because, first, no price was paid by the defendant for the property pretended to have been transferred; second, because, if there was an exhibition of a counting of money on the day of sale (which fact was denied), it was a mere sham, as he (defendant) again took possession of the money; because, third, the transfer of the totality of the property to defendant, especially under the circumstances attending the same, was not a contract made in the usual course of business, and it clearly indicated that the same was a simulation pure and simple, the more so that their father, Hypolite Barras, remained in possession of his effects alleged to have been sold.
Plaintiffs alleged that, if the amount of the price stated was paid (which was denied), then the price was so vile in comparison with the true value of the property that the pretended sale amounted only to a disguised donation; that the disproportion between the actual value and the price was so great that the transaction, if real, amounted simply to *287 the giving of an undue advantage by their father to the defendant, one of his children, to the prejudice and detriment of the plaintiffs, his other children, divesting them of their legitime; and, even if viewed as the giving of an undue advantage of defendant, the same was without effect, as no mention, as required by law, was made that he (their father) intended this advantage to be over and beyond what was coming from his said estate to him. Plaintiffs gave in their petition a detailed description of the property transferred to defendant, and averred that its true value was $15,846.
Plaintiffs averred that defendant took possession of all the property and effects of their father immediately upon his death, leaving plaintiffs without the means of ascertaining whether there was any counter letter or other document left by their father; that he had refused to deliver to them the property alleged to have been transferred to himself, to their great damage and injury, who had thus been deprived of their inheritance and legal possession of the said property.
Plaintiffs prayed for a moneyed judgment against defendant in conformity to their allegations, and for judgment setting aside and annulling the pretended sale made by their father to defendant, and decreeing the property therein declared to have been sold to belong in common to them and defendant, each for an undivided seventh.
Should any of the property included in said alleged transfer have been disposed of by defendant previous to the institution of their action, and the same could not be recovered, they prayed that their right be reserved to claim six-sevenths of the value of the same from defendant. Contingently to meet the court’s decreeing that a price had been actually paid by defendant to their father for the alleged transfer then (by reason of the vileness of the price), they prayed the transfer to be decreed a disguised donation, or a transaction giving an undue advantage to defendant, and as such null and void in so far as petitioners were concerned, and the property alleged to have been transferred, to belong in common to petitioners and defendant, subject to reimbursement to defendant of any amount which he might prove to have been disbursed and parted with in connection with the said transfer. They prayed for all necessary orders and for all and general relief. Plaintiffs’ suit was instituted on the 23d of August, 1902.
Defendant averred that, in so far as concerned plaintiffs’ claim and demand having reference to interest emanating from the succession of Clemence Barras, their mother, they were estopped by the allegations of their own petition, and were without right and without cause of action against him; that, even if plaintiffs did at any time have a right or cause of action against him regarding the partial settlement set forth in reference to the succession of Clemence Barras, plaintiffs were each of them estopped, and could no longer question, inquire into, or invalidate his acts or gestión as their alleged agent and mandatory for this: that shortly after the alleged partial partition of November, 1893, and after he had sold a certain number of said cattle, and employed the proceeds to satisfy some of the debts of said succession, the balance of cattle remaining after said partial partition were finally shared between all parties, each taking and accepting without protest or objection his respective portion thereof, approving the previous acts and disposition made by defendant as their agent and mandatory, and had since then acquiesced therein. In case it should be adjudged that the plaintiffs had a right and cause of action, and were not es-topped, he pleaded in bar of their action and demand against him regarding said matters touching the succession of Clemence Barras the presctiption of one, three, and five years. He prayed that plaintiffs be decreed to have herein no right or cause of action, and, in the alternative, if they had, that they be held estopped, and that, if not estopped, that their demand be held prescribed by the prescriptions pleaded.
Defendant excepted that plaintiffs’ petition disclosed no right of action to question or assail the act of sale of October 11, 1893, by Hypolite Barras to him, on the ground of vileness of price, for the reasons:
First. Because no tender of the price paid as the price mentioned in said act is averred to have been made previous to the institution of the suit.
Second. Because no tender of the amounts, or any of them, disbursed by defendant, such *289 as taxes and others, necessary to the preservation of the property since his acquisition thereof was averred.
Third. Because said right, if it ever did exist, was barred by the prescription of one, three, and five years.
Even if said right did at any time exist— which was denied—and in case plaintiffs were not estopped by their own averments and were not barred by prescription, he specially denied that the sale was a simulation or a fraud, but, on the contrary, he maintained that the sale was a real, true, and bona fide one, made and accepted, that the stipulated price and consideration as therein shown were by him paid, and received by Hypolite Barras, his vendor.
He specially denied that the counting and pa5rment of the said sum constituting the price of said property so purchased was a mere sham, or that he ever again took possession of said money.
He specially denied the averment that his vendor, Hypolite Barras, remained in the possession of the property so transferred to him, and averred that he himself, by virtue of said deed, did take and keep possession thereof.
Reserving specially all rights under the pleadings and the exceptions filed, and waiving none, he further denied all and singular the other allegations of ifiaintiffs’ petition.
The district court rendered judgment in favor of the defendant rejecting plaintiffs’ demand. It adjudged and decreed that the sale made by Hypolite Barras to Auguste Barras of date of the 11th October, 1S95, of the property mentioned therein, was a valid, lawful transaction, made and accepted bona fide by the parties thereto for the real consideration and in the manner and form therein set forth and stipulated.
Plaintiffs appealed.
The plaintiffs are six of the seven children, issue of the marriage of Hypolite Barras and his wife, Clemence Barras; defendant being the seventh child.
The mother, Clemence Barras, died in July, 1.893; the father in 1902. The succession of the mother was opened in the district court through a petition of Hypolite Barras praying that an inventory with appraisement be taken. An inventory was accordingly made' on the 18th of July, 1893, before James Simon, notary public, which was accepted as correct by the surviving husband and the heirs of the wife.
On the 24th of July the surviving husband filed a second petition, in which, after reciting the action taken prior thereto, that the property was all community property, and there were some debts due by the community, he applied to be appointed administrator. Still later, on the 29th, he applied for an additional inventory, alleging that there was in the parish of St. Martin some property of the community which had been omitted. No action seems to have been taken under these two petitions. As the property of the community was in his possession at the time of his wife’s death, and it would so remain until partition was effected, and he was primarily liable therefor, it was the duty of the father to have had this second inventory made. On the 11th of November, 1893, all the parties in interest appeared before James Simon, notary public for the .parish of St. Martin, the children of Clemence Barras appearing as forced heirs of their mother. Appearers declared that they were the co-proprietors and undivided owners of all the property mentioned in the inventory of the 19th of July, a copy of which they annexed to. the act; that it was their wish, desire, and intention to put an end to the state of indivisión in which they were, as regarded the property as it stood mentioned and described therein, and to partition said property amicably between them, and also of all such property consisting of cattle, horses, and mules, that was not inventoried in said inventory, by mutual consent each of every one of the appearers accepting and taking the share and partition coming to him without any other formality than such as was taken and resorted to in that proceeding, and according to the agreement therein entered into between them, and in accordance with the allotment of said property to each other of their respective share and partition in the property described in the inventory as would be mentioned in the act. The parties then proceeded to a partition of the property so referred to. Article 73 of the inventory, “One vacherie or cattle stock in the parish of Vermillion and the brand of said vacherie, valued at $700,” does not seem to have been included in the partition. Before closing the *291 partition the parties seem to have altered their minds as to the extent of the partition then made, as appears by the following recitals:
“It also appearing that the movable property mentioned in said inventory under items 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, and 72 have not been divided between said appearers, and which was omitted by consent of said appearers, they hereby consent and agree that the above-mentioned property shall be divided between them—the movable property, consisting of cattle, horses, mules, and sheep, as ábove mentioned, that. was not included and inventoried in said inventory, etc.; the above division to be made at such time as they shall agree between themselves to be made without recourse to a written act of partition, and each appearer to receive his share therein according to his respective rights and standing in said estate of Mrs. Clemence Barras as aforesaid; and it is further agreed that the division above mentioned shall not be made before the sale of a certain part of the above-mentioned property which had to be made thereof and as herein below mentioned, and at which time and occurrence the said property remaining after said sale shall be divided in accordance with this agreement.
“It also appearing that the community heretofore existing between Clemence Barras and her surviving husband, Hypolite Barras, is indebted in an amount of one thousand dollars, the said appearers above named hereby consent and agree that said indebtedness of said community shall be paid and satisfied out and from the sale of a certain number of cattle, horses, or mules, the undivided property above mentioned, as will be sufficient and necessary to satisfy and pay in full said indebtedness, and to which sale of said property all the said appearers consent and agree, the same to be made by one of said appearers, whom they shall name between them; and the said appearers further agree and consent that the cost of these proceedings and all the costs incurred in said estate and for the opening of the same shall also be paid and satisfied by sale of the property as above mentioned, and at the same time and under the same agreement; and the appearers further agree that after the sale of said property as above mentioned to carry out and put into effect the agreements between them as to the division of said movable property above mentioned, the time of said sale as above set forth to be hereafter fixed between appearers by, agreement between them.”
The items in the inventory from 62 to 72, both inclusive, referred to stock, horses, wild mares, milk cows, calves, mules, beeves, and sheep, aggregating in value the sum of $2,-345; the beeves being mentioned as 25 in number, and value at $16 a head.
Clebert Barras, one of the plaintiffs, testified that Auguste Barras, the defendant, was selected as the party to sell the cattle for the reason that he had the business of his father in charge, and that his father, Hypolite Barras, was authorized to settle the debts of the community. He claimed there was a thousand dollars due.
From receipts exhibited on the trial of the cause it would appear that the indebtedness of the community was over $2,100, leaving out of consideration a claim of the father against the community for $1,000, which was referred to vaguely in the testimony.
Hypolite Barras, the father, who was in possession of the community property at the time of the death of his wife, and who was primarily liable to the creditors of the community for its debts in their entirety, remained thereafter in possession under an accountability to the heirs of the wife for one-half of the community property after payment of debts.
The effect of the partial partition made before Simon, notary, was to operate pro tanto a breaking up of the condition which had existed up to then in the things partitioned, and to vest separate ownership and possession in the-property allotted to them; but the father continued after that partial partition in the possession of the portion of the community property not included in or omitted from the inventory, which remained undisposed of, accountable to the unpaid creditors as before, and accountable ultimately to the heirs of' the wife for the residuum which would be found after payment of the community debts. These heirs do not pretend to have themselves paid a dollar of this indebtedness. The entire indebtedness of the community was paid by the father either directly or through Auguste Barras, who seems to have *293 continued to attend to his father’s affairs up to the date of his death. The payment of the entire indebtedness was made (as testified to by Auguste Barras himself) out of the proceeds of sales of community cattle, which he (Auguste Barras) had made. Plaintiffs concede that, after the making of the partial partition before Simon, notary, all the movable property consisting of mules, cows, sheep, etc., which had remained undisposed of was equally divided between the father and his children, with the exception of a number of oxen, which they claim were sol'd by Auguste Barras during the father’s life without the proceeds of the sale having been accounted for by him either to their father or to them. They maintain that said proceeds were never divided. They seek in this action, as heirs of their mother and as heirs of their father, to hold their brother Auguste Barras directly responsible to them for the six-sevenths of the value of these oxen, which they fix at $18 a head. The highest estimate placed by plaintiffs in their testimony upon the number of these oxen was 120. We do not regard Auguste Barras as ever having had possession of these oxen as an agent for the purpose of the liquidation of the community affairs. The father, as head of the community, was, as we have said, in possession, and subject himself to liability to the creditors for their claims, and subject to accountability to the heirs of his wife for the residuum of the community property which might be in his hands after payment of community debts. As against accountability by the father for the value of 120 oxen there is disclosed payment of community debts either by the father, or Auguste Barras for the father, to an amount of over $2,000. The claim made by the plaintiffs for the six-sevenths of the value of oxen sold was, we think, correctly rejected by the district court. The result may not be strictly accurate, for the testimony (as the district judge declared) was exceedingly unsatisfactory; but the plaintiffs,’ instead of calling for a speedy liquidation of the community affairs, permitted matters to drift until after the death of their father, when the precise situation could no longer be ascertained. This court, by no decree of its own, would more likely to be correct and to do justice between the parties than has been done by the judgment of the district court. The issue between the parties remaining yet to he disposed of is as to the reality of the sale made on the 11th of October, 1895, by the father, Hypolite Barras, to his son, the defendant, Auguste Barras, by act before Simon, notary, the object and effect of which plaintiffs declare was to give an undue advantage to their brother, a mere nominal vendee, and to divest them of their legitime in the succession of their father.
The reasons assigned by the plaintiffs 'in support of their claim that the act of 11th of October, 1895, before Simon, notary, was a simulation, not a sale, were: First. Because the price declared therein to have been paid for the property was so small in comparison with its actual value that the act was presumably a simulation. Second. Because the so-called sale was a transfer omnium bonorum, by the father to his son, when he owed no debts, and there was and could be no motive on his part for making the same other than that of favoring the defendant to their prejudice. Third. Because the father remained on the property declared to have been transferred from the date of the sale up to the period of his death, receiving all the revenues therefrom during that time, and directing all business matters connected therewith. Fourth. Because the father was an old man at the time, with very simple tastes and good habits, and yet in the short time between the date of the sale and his death all trace of the moneys asserted to have been paid to him as the price of the property was lost, and had entirely disappeared.
The defendant took the stand as a witness in his own behalf. In respect to this sale the following testimony was elicited from him:
“Q. Will you explain why it is that the land-mentioned as No. 2 in plaintiffs’ petition was left in the enjoyment and use of Hypo-lite Barras after 1895, from the day that you bought it?
“A. Because my father resided with me. He was quite aged. After he sold the land to me he told me, T will go and reside at Anse Catahoula, go and come, raise hogs, and supervise and take care for you of those persons who are working those lands for you;’ and he went to reside on that land.
“Q. Why is it that you allowed him to do so?
“A. This I did because I knew that, being *295 my father, it was not because I had bought this property that I should have expelled him from it, for he had to have some place to stay.
“Q. How is it, and for what reason did you allow him to make a settlement with the tenants, receive the amounts due, and so on, on that tract of land?
“A. This I did because I wanted to allow him the privilege there at his ease, without the difficulty, and spend the balance of his days that were left very quietly.
“Q. Who paid for all the repairs, improvements, and other things that were made on that land that was left in the possession of your father from the day that you bought it?.
“A. I did.
“Q. Were not all those several tenants working that land in shares there, long prior to your purchasing it from Hypolite Barras?
“A. Yes.
“Q. Is it not a fact that they were allowed to remain and continue there to work that land as they had previously done, without any change in contracts or agreements?
“A. In the same manner. I did not change anything.
“Q. At what age did your father die?
“A. Seventy-nine.
“Q. What was the condition of health of your father for the few years preceding his death?
“A. He was always sick; every winter he was sick.
“Q. During those years, at whose home did he stay, and who attended and provided for him?
“A. Myself.
“Q. Did he stay at your home?
“A. I went to get him on my place at Catahoula and bring him at home.”
Cross-Examination.
“Q. You said you allowed your father to manage the tracts of land mentioned by the witnesses after you had bought the land for the purpose of procuring him ease during his life. What do you mean by procuring him ease? Was he to keep the revenues, or was he simply to work, and not get anything for the management?
“A. It would not be legal to make him work without giving him something. I allowed him and gave him the revenues.
“Q. Your father was a man that was simple in his habits; that is, he was not a spendthrift?
“A. No.
“Q. Were those revenues sufficient to provide for his necessities?
“A. More than sufficient.
“Q. You said that, although you bought the property of your father, you understood it was your duty not to turn him out. Was it because he had no other property?
“A. Yes.
“Q. Did you not understand that you were buying all that he had?
“A. Yes, as regards cattle and land; no question of silverware (spoons not mentioned in the act of sale).
“Q. Where did your father die?
“A. At my house.
“Q. Where did he live beside the place where he died during the last days of his life?
“A. Sometimes in Catahoula Cove on land item 4th, and sometimes at my house, which is item No. 7 in the petition. He would spend two or three days in one place, and then go on to the other.
“Q. Who had charge of his business?
“A. Himself alone.
“Q. Mr. Barras, on the day of the sale, October 12, 1895, did you pajr to your father three thousand four hundred and sixty-nine dollars in cash?
“A. Yes, sir.
“Q. Did you count the money?
“A. Yes, sir.
“Q. Did he take it?
“A. Yes, sir
“Q. What did he do with it?
“A. I don’t know.
“Q. What became of that money?
“A. I don’t know.
“Q. Did you not get back that money from him to keep it for him?
“A. No.
“Q. Where was that sale passed—at what place?
“A. At my house.
“Q. Where did he put that money that day?
“A. He kept a safe at my house—an old safe.
“Q. Was that locked?
“A. Yes, sir.
*297 “Q. Did he put it in that safe?
“A. Yes, sir.
“Q. Who had the key to that safe.
“A. Him.
“Q. Him alone?
“A. Yes, sir.
“Q. Did you not have that key also?
“A. No, sir.
“Q. How long did he leave that money in that safe?
“A. The next morning he went to Catahoula Cove, and took the money with him.
“Q. How was the money—silver, gold, or greenbacks?
“A. Gold and greenbacks.
“Q. Was it a large package?
“A. Not very large.
“Q. He went alone?
“A. Yes, sir.
“Q. Did he have a safe at Catahoula Cove?
“A. I don’t know.
“Q. The safe at your place—he was the only one to use it?
“A. It was a kind of bureau. He used it as a safe. It was a wooden bureau.
“Q. He took it away the next morning?
“A. Yes, sir.
“Q. He never brought it back?
“A. No, sir.
“Q. Did you ever see that money at Catahoula Cove after that?
“A. No, sir.
“Q. Did you ever see him disburse any of that money after that?
“A. No, sir.
“Q. You don’t know whether he ever paid a cent of that money to any one after that?
“A. No, sir.
“Q, You said, with the revenues, he had more than he needed to pay hiá expenses?
“A. Yes, sir.
“Q. Therefore he did not need that money?
“A. I don’t know.
“Q. Did you ever look for that money before his death?
“A. No, sir.
“Q. You said you never saw him spend any of that money?
“A. No, sir. I did not follow him always. I cannot say whether he spent it or not.
“Q. Where did he go generally—your father ?
“A. Came home, go to Pothier, also to my place above Breaux Bridge, and stayed at Pothier sometimes.
“Q. You say that your father was not a spendthrift?
“A. Not of his habits.
“Q. Was he not economical?
“A. He was not a miser. He did not throw away his money, 'but he was not afraid to spend money when it was needed.
“Q..Since you bought that property from your father, did he travel to New Orleans and outside of the parish?
“A. Well, sometimes he would go to New Iberia.
“Q. Did he go alone?
“A. He went with me.
“Q. Did he spend much money?
“A. Well, I did not follow him all day.
“Q. Did you see what money he had when he left?
“A. No, sir.
“Q. How came you to buy those lands?
“A. Because I km a land buyer.
“Q. Did you ask him to sell, or did he ask you to buy it?
“A. I asked him to buy a piece of that land. A couple of months after that he said if I wanted to buy some land he would sell me all he had. I asked him why he wanted to sell all, and he said he was getting old, and did not care about keeping what he had.
“Q. He would sell you all he had?
“A. Yes, sir.
“Q. Did you fix the price that day?
“Á. Yes, some of them; some not.
“Q. It was on the day you passed the sales that you fixed the price?
“A. Yes, sir.
“Q. This sale is for the whole?
“A. The sale is for the whole. We fixed the price of some of the lands on the day of the sale; others we fixed before.
“Q. Did you not understand from your father that you were to give to your brothers and sisters their share of the lands you had purchased?
“A. Of course not; that is apart.
“Q. You are sure that you never looked where that three thousamd dollars had gone?
“A. Yes, sir.”
This case closely resembles, though it differs in some respects from, that of Cole v. *299 Cole, 39 La. Ann. 878, 2 South. 794. Here, as there, an old father In affluent circumstances, without any necessity for so doing, transferred the whole of his property to one of his sons towards whom he stood, in close relations. Here, as there, the vendor remained upon the property transferred, attending to matters, and receiving its revenues; as if no transfer had been made. In the Cole Case the vendee did not take the stand as a witness, but relied on the recitals of the act to carry with them of themselves full verity. In the present case at bar the vendee testified. In the Cole Case the vendee was shown affirmatively to have not had the means wherewith to purchase the property at the price stipulated. In the ease before us no issue on that subject has been raised at all. The testimony in this record adduced on the subject of the value of the property transferred to defendant, Auguste Barras, as compared with what may be its actual value, is not such as would" authorize us to declare the act a simulation, through a presumption juris et de jure, under article 2444, Civ. Code, but simulation is not limited as to its ascertainment by the test provided by that article. Other presumptions, even though they be not so absolute, are permissible for that purpose. It is sometimes intimated that testimony which is direct and positive cannot legally be rebutted and overturned by presumptions less high tlian those which are juris et de jure in the absence of impeachment of the credibility of the witnesses. We are not prepared to accept that proposition unqualifiedly. Courts are constantly called upon to pass upon cases whose decisions rest upon the relative probative weight therein of direct evidence upon one side opposed to presumptions of fact upon the other. It may be said that we must either accept defendant’s testimony as true or brand it as false, but this by no means follows. It may be that every word of his testimony is true, and yet the whole actual situation should not have been developed thereby. When men propose evading prohibitory provisions of law, human ingenuity is taxed to so place matters as that some of the testimony adduced in connection therewith should be true, while other matters, which, if brought out, would utterly destroy its effect, should be skillfully concealed. The facts of this case go very strongly to establish simulation. The whole situation was out of the usual course. Le Blanc v. Bertant, 16 La. Ann. 298. It is difficult to understand why this old man owning the property without incumbrances should have been willing without a motive to dispose of the whole of the same in block, and substitute for it money, with all’ the annoyances which its possession would carry with it to a person of his age; and it is difficult to understand what became of the money said to have been paid to him in the short interval between the date of the sale and that of the father’s death. That the son, who, for so many years had taken charge of his father’s business, should become so completely and suddenly indifferent to what should become of this money in which he was interested as a prospective heir, and that he should have so utterly lost sight or knowledge of it, unduly taxes credulity. We can readily conceive of a condition of affairs such as would leave defendant’s testimony true, but none the less the act of sale would be unreal in the form it was passed.
A fact which impresses us unfavorably as to the reality of this particular act was the production for the purpose of the trial, of the first issue raised in this case, of a duebill executed after this sale by Hypolite Barras in favor of the defendant for $1,045, with 8 per cent, interest, as for money received from him with which the father made payment of the community debt for that amount to the Eontenette heirs. This amount was shown not to have been borrowed from the son, but to have been the proceeds of beeves of the community sold by defendant. Had this fact not been shown, the father would have appeared, notwithstanding his frugal habits, to have disposed of the whole amount of this sale, and to have been forced to borrow additionally this large amount from the defendant. We have reached the conclusion in this case that the act passed on the 11th day of October, 1895, before James Simon, notary public, did not evidence a real bona fide sale of the property therein conveyed by Hypolite Barras to the defendant, Auguste Barras, but that the form of the act was resorted to with the intention of effecting an undue preference by the father to the apparent vendee, to the prejudice of the brothers and sisters of the latter. Such being its *301 object and purpose, we cannot allow it to stand, or to be recognized as a sale. It should be, and it is hereby, set aside as a sale. We do not think we are called upon to presently affix any particular character to that act, and we hereby expressly reserve and leave that matter open between the parties, to be determined hereafter according- to the respective rights, and as shall be shown hereafter to be right and proper under the facts of the case.
For the reasons herein assigned it is hereby ordered, adjudged, and decreed that the judgment of the district court in so far as it adjudges and decrees that the sale by Hypolite Barras to Auguste Barras of date October 11, 1895, of the property mentioned in said act, is a valid, legal transaction made and accepted bona fide by the parties thereto for the real consideration and in the manner and form set forth and stipulated, be, and the same is hereby, annulled and avoided and reversed, without, as has been heretofore stated, prejudice to the rights which the parties may have in the premises, not inconsistent with this judgment and decree. Except as the judgment appealed from is altered and affected by this judgment, it is hereby affirmed. Defendant and appellee is decreed to pay the costs in both courts.