This case involves the proposed development of an apartment complex on a 10.1-acre tract of land adjoining the Cherokee Hills, Woodland Hills, and Beech Hills subdivisions of the City of Tuscaloosa. The appellees are owners of residential property located in those subdivisions. The appellants are the City of Tuscaloosa; the city's mayor, Al Dupont; and city commissioners Hilliard Fletcher and Banks Quarles. The appellees filed their complaint in the Circuit Court of Tuscaloosa County, seeking a declaratory judgment and an injunction against the development of the apartment complex as proposed. The trial judge, Honorable John M. Karrh, after hearing ore tenus evidence, found in favor of the appellees and granted the injunction. We affirm.
Judge Karrh's judgment reads as follows:
"This case arises out of a decision by the City of Tuscaloosa to allow an extension of a currently existing ninety-unit apartment complex onto approximately 10.1 acres of currently vacant land which is zoned R-1 and adjoins or is close to the homes of the plaintiffs. The plaintiffs filed this action and have asked declaratory and injunctive relief which will declare the action of the City to be illegal and permanently enjoin the building of the said apartment complex. Essentially, they maintain that the City violated its own Zoning Ordinance and related Subdivision Regulations by: (A) approving the said extension by calling it a Planned Unit Development (PUD) when it does not meet the requirements of a PUD; and, (B) not following mandatory procedural requirements. Although the owners and putative developers of the 10.1 acres were not originally named as defendants, they have been allowed to intervene as defendants and have participated fully in the defense of the case.
"A full ore tenus hearing before the Court was held on all issues on June 25 and 26, 1985. Numerous witnesses were heard and voluminous maps, charts, plats, photographs and documents were admitted into evidence. In addition, at the specific request of all parties, the Court conducted an on-site inspection of the current existing apartment complex, the area proposed for the expansion, and the surrounding area.
"Based upon the pleadings, all evidence legally presented (including the Court's tour), and the applicable law, the Court *Page 332 
makes the following findings of fact and conclusions of law:
"1. In the mid to late 1960's the developer/intervenor (hereinafter 'developers') successfully petitioned the City to rezone approximately 9.2 acres of land they owned on Loop Road from R-1 to a designation that would allow an apartment complex to be built. The acreage adjoined Loop Road — a major traffic artery — and was buffered from most of the residential areas behind it, including Cherokee Hills and Woodland Hills, by the 10.1 acres which is the subject of this litigation and which remained zoned R-1.
"2. Within a couple of years of the rezoning, an apartment complex of ninety units was constructed on the 9.2 acre plot. This was done in two stages. The complex is generally known as Williamsburg East but in some exhibits is called Williamsburg I and II. Although the apartments of Williamsburg East would generally be deemed to be nice and desirable apartments, the land was cleared of trees and there is almost no usable open space within the complex. A relatively small swimming pool and incidental clubhouse was included at the back of the 9.2 acres for the use of the residents.
"3. Subsequently, the owners of Williamsburg East purchased the 10.1 acres between the apartment complex and the surrounding residential property. The developers knew at the time of purchase that the property was zoned R-1.
"4. The residential lots surrounding the 10.1 acres vary somewhat in terms of the size of the lots and the houses as well as their condition. However, in general, the lots are large with a great deal of vegetation and resultant privacy. All are single family residences. The Court accepts the testimony of the homeowner plaintiffs who believe their property will be devalued economically or aesthetically if an apartment complex is built on the 10.1 acres. During the entire period relevant to this litigation, the 10.1 acres has been zoned R-1 or its equivalent.
"5. The City of Tuscaloosa has duly adopted a Zoning Ordinance and Subdivision Regulations pursuant to the enabling statutes provided by the Alabama legislature. See §§ 11-52-70
and 11-52-30, Code of Alabama.
"6. If the City of Tuscaloosa chooses to regulate land use then it must follow its own rules and regulations as are established in the Zoning Ordinance and Subdivision Regulations. Lynwood Property Owners [Ass'n] v. LandsDescribed, 359 So.2d 357, 359 (Ala. 1978); Smith v. City ofMobile, 374 So.2d 305, 307 (Ala. 1979); City of Guntersville v.Shull, 355 So.2d 361 (Ala. 1978).
"7. In early 1985, the developers decided to expand the currently existing Williamsburg East apartment complex into the 10.1 acres and to build ninety additional apartment units thereon. The apartments were to be similar in design to the existing units and the two developments were to be operated as an integral unit. No recreational or other amenities of any kind were ever planned to be provided on the 10.1 acre plat [sic].
"8. An 'R-1 Resident District' is defined by the Tuscaloosa Zoning Ordinance as follows:
 " 'This district is created to provide minimum standards for the development and use of single-family detached housing built on separate lots and fully meeting modern standards with respect to light, air, open spaces, and off-street parking.'
 "§ 35-31(a), Zoning Ordinance of City of Tuscaloosa.
"9. The developers applied to the Tuscaloosa Zoning Commission to have the 10.1 acres rezoned to RMF-1 so that the apartment units could be built.
"10. An 'RMF-1 Multi-Family Residence District' is defined by the Tuscaloosa Zoning Ordinance as follows:
 " 'This district is created to provide minimum standards for the development and use of apartments meeting modern standards with respect to light, air, parking, and usable open space.'
 "§ 35-31(e), Zoning Ordinance of the City of Tuscaloosa. *Page 333 
"11. The developers were turned down in their attempt to get a rezoning of the property to RMF-1 (the primary zoning designation for apartment complexes). Nonetheless, shortly thereafter they decided to attempt to get the apartment complex extension approved as a Planned Unit Development since PUD's are 'permitted uses' under the R-1 designation, if the requirements of the Zoning Ordinance related to PUD's are met.
"12. A 'Planned Unit Development' under the Tuscaloosa Zoning Ordinance is defined as:
 " 'A coordinated development laid out upon a tract of land, in single ownership or control. Subject to the provisions of this chapter, a Planned Unit Development may differ with respect to lot size, bulk or type of building, permitted land uses, lot coverage, and required open space from the standards otherwise prescribed for the district concerned. (See Article XII.)'
"§ 35-5(41), Zoning Ordinance of the City of Tuscaloosa.
Article XII of the Zoning Ordinance includes §§ 35-121 through -126 and specifies the standards that must be followed if a developer is to be permitted to use land in an R-1 area as a PUD for other than single-family residences.
"13. Statutes and ordinances providing for land use restrictions are to be strictly construed. Smith v. City ofMobile, 374 So.2d 305, 307 (1979).
"14. § 35-4 of the Zoning Ordinance of the City of Tuscaloosa explicitly states that the standards established therein are the 'minimum requirements' and that the regulations which require the greatest restrictions are always to be controlling. Further, the General Development Plan for the City of Tuscaloosa, at page 105, states that 'Subdivision, building, housing and zoning ordinances should be strictly enforced.'
"15. § 35-5 of the Zoning Ordinance of the City of Tuscaloosa states that as used in the Zoning Ordinance: 'The word "may" is permissive; the word "shall" is mandatory.'
"16. § 35-122 of the Zoning Ordinance provides the specific 'criteria' that must be met by any proposed PUD in Tuscaloosa.
"17. § 35-122(b) requires that 'a tract proposed for PUD should consist of a single contiguous tract . . .' of at least 15 acres unless the design of the PUD 'possesses extraordinary merit.'
"The proposed PUD is to contain sixty units instead of the original ninety planned. Other than the small increase in the space for yards behind and around the apartment units which the decrease provided, no other changes of substance were made in the proposed development before it was submitted as a PUD. The large area of space on the proposed plat set aside as 'permanent open area' to be dedicated for the use of the community is in fact primarily composed of a steep and deep ravine which is not usable for any purpose — recreation or otherwise. Although there are designations within this 'open area' of two 'lakes' on the plat submitted to the Planning Commission and the City, there are, in fact, no lakes on the plat. Those areas were referred to in other plats as 'silt collecting ponds.' In any event, the area is of no usable benefit to the residents. Consequently, the trade-off usually made between the City and the developers to allow a higher density of living units for creative development of usable common space does not exist.
"Almost all of the usable acreage within the 10.1 acres will be denuded and excavated and will be consumed with the apartments, streets, and parking places. As has been found above, the apartments will be similar in design to those in the existing apartments. Some of them will be as close to adjoining R-1 property lines as thirty feet.
"The proposed extension of the apartment complex would be a 'nice' apartment complex but is neither unusual nor extraordinary in merit. The planning Commission found in its written report to the City Commission that the site plan is not extraordinary. This is not a fairly debatable issue.
"18. § 35-122(C) of the Zoning Ordinance mandatorily requires that there be *Page 334 
no more than 4 dwelling units per gross site acre in an R-1 district. The proposed PUD would have 60 units in 10.1 acres even if the developers are allowed to count the acreage in the ravine area. Thus, there are 5.94 units per gross site acre — approximately 1/3 more than allowed.
"The developers point to the provision of § 35-122(C) of the Zoning Ordinance that provides for an increase of two dwelling units per gross site acre if the tract plan also includes 'major recreational amenities' such as swimming pools or tennis courts. However, there are no recreational amenities provided within the proposed PUD tract. The fact that there is a small swimming pool that may be available to the residents outside
the tract does not address the mandatory requirement of § 35-122(C). Moreover, even if the swimming pool were erroneously considered by viewing the existing complex and the proposed extension as one development, the dwelling unit density would be 7.7 units per gross site acre and would still be above that allowed by the Zoning Ordinance.
"19. § 35-122(D) of the Zoning Ordinance requires in mandatory terms that the 'open space' designated in a plat shall have not less than twenty feet of frontage on a public street. This is not provided in the proposed PUD.
"20. § 35-122(F) of the Zoning Ordinance requires that 'the provision of streets . . . shall be as required by the Tuscaloosa Subdivision Regulations.' § 4.3 of the Tuscaloosa Subdivision Regulations provides for a minimum of a 30-foot width for 'local service streets,' the most narrow of all streets allowable. The width of the major access street in the proposed PUD is 24 feet.
"21. § 35-123 of the Zoning Ordinance provides for certain mandatory procedures to be followed before tentative and/or final approval can be given to a PUD. These mandatory provisions were violated in numerous ways in the process of giving final approval to this apartment complex extension.
"22. § 35-123(A) of the Zoning Ordinance states:
 " 'A developer desiring to build a PUD shall submit to the Planning Commission an application for tentative approval consisting of the following:
" '. . . .
 " '3. A sketch site plan or plans[, which] shall contain the information required by the Tuscaloosa Subdivision Regulations for a Preliminary Plat, provided that such plans shall
be drawn at a scale not smaller than one (1) inch equals forty (40) feet, and shall include the outline of proposed parking areas, the size, height, and layout of buildings, the layout of proposed open space and existing trees to be preserved or destroyed (emphasis added [by Judge Karrh]).'
"Contrary to the clear language of § 35-123, the scale utilized in the Preliminary Plat of Williamsburg East, Phase III was one (1) inch equals fifty (50) feet; nor were the heights of the buildings shown on the site plan.
"Contrary to the mandatory language of § 7.1 Preliminary PlatRequirements, the following data [were] omitted:
 " 'Access to a planned unit development across private property requires the designer to provide the deed book and page number of the easement granting a right-of-way for access to the planned unit development. Section 7.1(5).
 " 'The locations, widths and other dimensions of proposed open space. Section 7.1(6).
 " 'Page 6 of the Final Plat/Development Plan of Williamsburg East Phase III shows an existing sanitary sewer easement, yet the locations and dimensions of the existing sanitary sewer lines were not shown on the Preliminary Plat in accordance with § 7.1(8).'
"Sub-paragraph 4 of § 35-123(A) provides that a statement is required to be filed by the developer, setting forth the approximate cost of each dwelling to be contained in the planned unit development. This was simply not done.
"23. § 35-123(D) of the Zoning Ordinance states: *Page 335 
 " 'An Application for final approval shall be submitted to the Planning Commission. Said application shall include the following:
 " '1. A final Plat containing the data required in such a plat by the Tuscaloosa Subdivision Regulations (emphasis added [by Judge Karrh]).'
"Contrary to the mandatory language of § 7.3 Final Plat of the Subdivision Regulations, the following data [were] omitted.
 " 'The name and registration number of the subdivision designer [were] not given Section 7.3(1).
 " 'The locations and dimensions of all sanitary sewer easements were omitted. Further, the statement required by Section 4.10 of the Subdivision Regulations was omitted. Section 7.3(10).
 " 'No space was provided for approval of the City Engineer, the Secretary of the Planning Commission, and the authorized representative of the Health Department. Section 7.3(10).
 " 'There were no certificates and acknowledgments for the designer and owner as required in Section 35-2-51 of the Code of Alabama, 1975. Section 7.3(11).'
"The Subdivision Regulations in § 6.7 clearly state that . . . 'The Planning Commission shall not approve the Final Plat until they are notified by the City Engineer . . .' (emphasis added [by Judge Karrh]) that an improvement bond has been filed, in accordance with § 35-123(D)(3). As stipulated by the parties in open court, no improvement bond was made by the developers. Failure to provide the improvement bond violated 35-123(D)(3) of the Zoning Ordinance.
"24. The City of Tuscaloosa has clearly acted in violation of its own ordinances and regulations in approving the development of the extension of the apartment complex in the proposed tract.
"25. The City of Tuscaloosa acted arbitrarily and capriciously in approving the development of the extension of the apartment complex in the proposed tract.
"26. The City of Tuscaloosa deprived the plaintiffs of due process of law under Article 1, §§ 1, 6, and 22 of the Constitution of Alabama. See, e.g., Lynwood Property Owners[Ass'n], supra. (In light of the Court's ruling, it is unnecessary to decide whether the plaintiffs' federal constitutional claims are viable.)
"WHEREFORE, PREMISES CONSIDERED, it is hereby Ordered, Adjudged and Decreed as follows:
"1. The actions of the City of Tuscaloosa in giving preliminary and final approval for the proposed Planned Unit Development known as Williamsburg East Phase II (or sometimes referred to as Phase III) are declared to be null and void;
"2. The City of Tuscaloosa is enjoined from issuing a building permit for the development of said plat as proposed;
"3. The intervenor/defendants are strictly enjoined from taking any steps to begin construction on the said 10.1-acre plat based upon any prior tentative or final approval of the proposed PUD by the City of Tuscaloosa;
"4. All defendants are enjoined from taking any action inconsistent with the findings and conclusions herein;
"5. Costs are taxed in equal share to the City and the intervenor/defendants."
The appellants contend that the judgment of the trial court is due to be reversed because the PUD, as proposed, is not in violation of the applicable zoning ordinance. For the following reasons, we disagree.
We recognize that the PUD is a novel zoning concept, representing a modern, flexible approach to progressive municipal planning. 82 Am.Jur.2d Zoning and Planning § 106 (1976); R. Anderson, American Law of Zoning, § 5.16 and § 8.38 (1968); Dillon Companies, Inc. v. City of Boulder,183 Colo. 117, 515 P.2d 627 (1973); Lutz v. City of Longview, 83 Wn.2d 566, 520 P.2d 1374 (1974). In effect, ordinances such as the one in the present case provide for the reclassification of a relatively small area within a large zoned area. Such a reclassification may be *Page 336 
approved but only if certain procedures are followed and various conditions are met. These prerequisites are, in part, necessary to insure that such a reclassification scheme does not come into conflict with our well established prohibition against piecemeal or spot zoning. Alabama Alcoholic BeverageControl Board v. City of Birmingham, 253 Ala. 402, 44 So.2d 593
(1950); R. Anderson, American Law of Zoning § 5.14 (1968). Notwithstanding its flexibility, a PUD must still fit into a municipality's comprehensive zoning plan. Clearly, ordinances regulating PUD's are intended to protect neighboring property owners by setting out specific prerequisites which must be met by applicants prior to approval. Compliance with these prerequisites serves to insure that a PUD, as proposed, will fit into the municipality's existing comprehensive zoning plan. Therefore, there must be compliance with the ordinance. 82 Am.Jur.2d Zoning and Planning, supra.
The traditional view of zoning or rezoning is that it is essentially a legislative function. The passage of a zoning ordinance is a legislative act, and it is well established that municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable. If the adoption of the ordinance raises questions upon which reasonable differences may exist in view of all the circumstances, and the wisdom of the ordinance is fairly debatable, then the action of a municipal governing body in adopting the ordinance will not be deemed arbitrary, a court being unwilling under such circumstances to substitute its judgment for that of the municipal governing body acting in a legislative capacity.Cudd v. City of Homewood, 284 Ala. 268, 224 So.2d 625 (1969). In other words, after hearings and as the result of studies, certain municipal areas as a matter of legislative policy are designated for residential use, some for commercial use, and some for variations on those uses which are compatible with the objective sought to be achieved by the municipality.
The often cited case of Episcopal Foundation of Jefferson Co.v. Williams, 281 Ala. 363, 202 So.2d 726 (1967), sets out in detail the very well settled legal principle that if the question of zoning or rezoning is fairly debatable, a court will not substitute its judgment for that of the municipal government body acting in a legislative capacity. In theEpiscopal Foundation case, the Birmingham City Council, by amendment to its zoning ordinance, rezoned certain property from residential use to general business, office, and institutional use. Adjoining property owners brought suit, seeking a decree declaring that the amendment to the zoning ordinance constituted spot zoning and therefore violated their constitutional rights. After the Circuit Court of Jefferson County declared the ordinance void, Episcopal Foundation appealed. As its rationale for reversing the lower court's judgment and determining that the amendment of the ordinance was, in fact, valid, the Court stated:
 "While the court is given the power to review the validity vel non of an ordinance or other legislative act, it is not given the power to review the wisdom or unwisdom, or the rightness or wrongness of laws passed by the legislative power delegated to the City Council of the City of Birmingham, or like bodies. Ball v. Jones, [272 Ala. 305, 132 So.2d 120 (1961)].
 " 'Every intendment is to be made in favor of the zoning ordinance and the matter was largely in the legislative discretion of the municipal authorities. . . . Here the city commission is acting in the exercise of a legislative function and with a wide degree of discretion.' Marshall v. City of Mobile, 250 Ala. 646, 35 So. 553.
 "The courts should be slow to set up their own opinions as against those charged with and in position rightfully to perform such duty. The fact that the complainants (appellees) may suffer some financial loss and depreciation in the value of their property is not a test of the constitutionality of the zoning ordinance; nor is it a test to determine if *Page 337 
the zoning ordinance is arbitrary, capricious, inequitable and discriminatory. Leary v. Adams, 226 Ala. 472, 147 So. 391.
 "The question is whether the reclassification of Lot 1 of the Episcopal Foundation is sound and fair. If the question is fairly debatable, the court will not substitute its judgment for that of the City Council of Birmingham in the exercise of its legislative power. Leary v. Adams, supra."
281 Ala. at 367, 202 So.2d at 730.
This case involves a question of first impression in this state, and that question is: What is the scope of judicial review of a municipality's action in approving a planned unit development? A few jurisdictions have considered the question, and the scope of judicial review of a municipality's action in approving a PUD is discussed in 2 American Law of Zoning 3d, § 11.11 (1986), as follows:
 "The creation of a planned development district by special permit is, of course, subject to judicial review. Failure to comply substantially with the requirements of the ordinance will result in judicial disapproval, notwithstanding the validity of the basic legislation.
". . . .
 "While an amendment which creates a planned district is entitled to the customary presumption of validity, the court will examine the record to determine whether there is support for the legislative action and to determine whether the amendment is reasonable. Rezoning for planned development is a modern concept. In granting a development permit, the legislative body must determine whether specified conditions have been met by the landowner. This is an adjudicative decision subject to limited review. Where the planning board approved the plan but was overruled without any supporting evidence, the trial court properly reversed the city council's decision. . . ." (Emphasis added.)
Our standard of review of the approval of a PUD application should be the same as our standard of review of the rezoning of an area. In both cases, the ordinance has been adopted. The action reviewed is the change of use of property. InEpiscopal Foundation, we held that in rezoning an area the standard of review should be whether the reclassification is sound and fair. If it is fairly debatable as to whether the reclassification is sound and fair, the Court will not substitute its judgment for that of the city council.
In the present case, the trial judge determined that the approval of the PUD application, as proposed, was not supported by the evidence and was thus void as being contrary to law. In making that determination he was required to construe and apply various provisions within the ordinance. The appellants' arguments are directed specifically to paragraphs 17 through 24 of the judgment. With respect to paragraph 17, they argue that the trial judge erred in substituting his findings for theirs on the question of whether the PUD, as proposed, possessed "extraordinary merit." With respect to paragraphs 18 through 24, the appellants maintain that the trial judge misinterpreted the various sections of the ordinance. For purposes of our discussion, we will begin with paragraph 18.
With respect to paragraph 18, the appellants argue that it is not mandatory that "major recreational amenities," such as swimming pools and tennis courts, be provided within the PUD itself. They cite to the ordinance, which states only that such facilities must be "provided" in order for the developer to qualify for a density bonus. We cannot accept this interpretation.
The cardinal rule for the construction of a statute is to ascertain the legislative intent, which must be determined by examining the statute as a whole in light of its general purpose. Gulf Coast Media, Inc. v. Mobile Press Register, Inc.,470 So.2d 1211 (Ala. 1985). The same rule applies with respect to the construction of an ordinance. Custred v. JeffersonCounty, 360 So.2d 285 (Ala. 1978). *Page 338 
Based upon our examination of the ordinance, its general purpose, in our view, is to provide a means by which a developer may secure the reclassification of a relatively small area within a large zoned area. The ordinance undertakes to strictly regulate the development of this "area within an area." Accordingly, we agree with the trial judge that the intent of the ordinance, notwithstanding the way the appellants treated it, is to require that recreational facilities be "provided" within the PUD itself.
With respect to paragraph 19, the appellants contend that the trial judge erred in applying § 35-122(D) of the ordinance under the particular facts of this case. That section reads as follows:
 "Lot Area and Common Open Space. In a PUD, minimum lot area, yard dimensions and other standards required in the district concerned may be reduced, provided that the resulting plan furnishes adequate privacy, light, air, and access to each dwelling unit, and provided that excess land remaining in the development by virtue of lot area reductions shall be preserved as permanent open space except where structures are needed to fulfill the educational, cultural, athletic, or civic pursuits of the residents of such PUD. At least one-half (1/2) of such excess land shall have a slope of less than fifteen (15) percent. Any such open space shall have not less than twenty (20) feet of frontage on a public street, and satisfactory access to fire equipment and open space maintenance equipment shall be provided. The articles of incorporation of any corporation established to own and maintain such open space
shall state that said corporation shall not be dissolved nor shall it dispose of the common open space, by sale or otherwise, without first offering to dedicate the same to the public." (Emphasis added.)
The appellants argue that since the proposed PUD is to consist of an apartment complex, there will be no individual "lost area reductions." We must agree. The requirements of this section are limited to open space generated by lot area reductions. The PUD, as proposed, is not subdivided into individual lots. Therefore, this section would seem to have no application.[1]
We find the appellants' arguments with respect to paragraphs 20 through 24 to be unpersuasive. The ordinance is very clear concerning the width of the streets required within a PUD, as well as concerning the application procedures to be followed before tentative and/or final approval can be given.
Finally, going back to paragraph 17, a proposed PUD which, like this one, fails to comply substantially with the conditions and requirements of an ordinance, cannot, as a matter of law, possess "extraordinary merit"; and the permitting of a PUD which does not comply substantially with the conditions and requirements of the ordinance permitting PUDs is not sound and fair and that is not fairly debatable. As a result, the plaintiffs were deprived of procedural due process when the appellants approved the PUD. Lynnwood PropertyOwners Ass'n v. Lands Described, 359 So.2d 357 (Ala. 1978). The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C. J., and MADDOX, JONES, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
[1] We note that "open space" is contemplated within the PUD as depicted on the preliminary plat. While the requirements of § 35-122(D) of the ordinance do not apply to this "open space" so as to require at least 20 feet of frontage on a public street, this should have no effect on the requirement that the dimensions of "open space" which is contemplated be set out in the preliminary plat. See paragraph 22 of the trial court's judgment. *Page 339