YATES, Judge.
In March 1988, Leroy Dykes and other residential property owners (residents) in Mountain Brook sued the City of Mountain Brook (the City) and the Mountain Brook Board of Education (the Board), seeking, among other things, damages and an injunction. The subject of the complaint was the development of an athletic complex by the City on property which was owned by the Board and which was located adjacent to Mountain Brook High School. The residents’ claims ranged from denial of due process to nuisance to misrepresentation, among others, and their complaint later was amended to include a claim under the Alabama Constitution for the taking of private property without just compensation. Thereafter, J.B. Owens Realty Company, also a local property owner, entered the lawsuit as an intervening plaintiff.
Following filings of motions to dismiss by the City and the Board, the trial court entered an order dismissing all claims of tort as to the Board, but overruling the motions in all other respects. Subsequently, both the City and the Board filed motions for summary judgment, and the residents filed a motion for partial summary judgment. In November 1991, the trial court entered an order granting the City’s and the Board’s motions for summary judgment. The residents’ motion to vacate the trial court’s order *715 was overruled and, consequently, they appealed.
The residents contend on appeal that summary judgment in favor of the City and the Board is inappropriate. Specifically, the residents claim the following: 1) the development of the athletic complex was unauthorized; 2) the actions of the City and the Board were arbitrary and capricious and violated the residents’ due process rights; 3) the residents’ claims are actionable under the “just compensation” clause of Art. XII, § 235, of the Alabama Constitution; 4) the residents’ claims are actionable under a traditional nuisance theory; and 5) there was substantial evidence of misrepresentation.

STANDARD OF REVIEW

Rule 56(c), Alabama Rules of Civil Procedure, provides that a summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Once a moving party has made a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to provide substantial evidence in support of his contention. Murdoch v. Knollwood Park Hospital, 585 So.2d 873 (Ala.1991). No presumption of correctness attaches to the decision of the trial court, and our review is de novo. Gossett v. Twin County Cable T.V., Inc., 594 So.2d 635 (Ala.1992). Also, in determining whether substantial evidence exists, we are to review the record in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Specialty Container Manufacturing, Inc. v. Rusken Packaging, Inc., 572 So.2d 403 (Ala.1990).

BACKGROUND

John McNeil, Jr., a former Mountain Brook city councilman from 1984 to 1988, testified that the concept of an athletic complex actually materialized several years prior to trial due to the inadequacy of original facilities. This particular project began, however, shortly after McNeil’s election to the city council in 1984, when it was determined that the best location for additional playing fields was the area around Mountain Brook High School. According to McNeil, plans at this point were progressing with only unofficial approval by the city council. Concurrently, Man Blalock, a landscape architect with the firm of Gresham Smith and Partners, was asked to prepare potential developments of the proposed location, using topographical maps. Although unsure of the timing, McNeil testified that the city council also directed the formation of a “steering committee” to oversee the project. McNeil further testified that the Board, which owned the proposed location, then was approached about the possibility of the use of this property.
Darrel McClain, superintendent of the Board, testified that his first formal knowledge of the athletic complex project came in December 1986. At that time, McNeil came to a Board meeting, proposed the development of the athletic complex on the Board’s property, and asked the Board if it would approve such a proposal. According to McClain, the Board formally approved the proposal with two stipulations: 1) that there be no cost to the Board, and 2) that the Board would have priority in using the property.
McNeil testified that the city council, the Mountain Brook Planning Commission (Planning Commission), and the Mountain Brook Board of Zoning Adjustment (BZA), reviewed an initial, preliminary plan of the project. McNeil also testified, however, that neither the BZA nor the Planning Commission again reviewed plans or revisions, and that the Planning Commission’s interests were guarded by the steering committee. According to McNeil, revisions from the original plans constituted only minor changes as to field locations; however, the project’s budget increased from $1.5 million to $2.5 million, primarily because of such unanticipated costs as building a tennis facility and a waste treatment plant. This increase in budgeting was presented to the city council, with the council agreeing to provide $1.5 million of the cost. The remainder was to be provided through private sector contributions.
Axel Bolvig, Jr., the Mountain Brook city manager, testified that the steering committee presented plans to the Planning Commis *716 sion in order to get approval for the property adjacent to Mountain Brook High School to be used as an athletic complex. According to Bolvig, however, the Planning Commission only approved the “general concept” of the use of the property as an athletic complex, and did not approve an architectural drawing of the facility. Bolvig also testified that, based on his understanding of the Mountain Brook zoning ordinance (ordinance), the role of the BZA as to the athletic complex project was limited to a review of the adequacy of the parking facilities and the road systems. Bolvig stated that, in fact, the BZA approved only these aspects.
Blalock testified that the steering committee directed him to submit an original development plan to the Planning Commission and the BZA, and that, afterwards, neither of these agencies considered subsequent drawings, although changes were made. In sum, Blalock stated that the athletic complex would consist of soccer and football fields, softball and/or baseball fields, additional tennis courts, jogging and hiking trails, and children’s playgrounds. Subsequently, several of the residents testified by deposition that light fixtures had been erected next to the soccer fields located behind their homes.

ORDINANCE PROVISIONS

Section 19-20 of the ordinance provides the following for districts zoned “Residence A”:
“(a) Off-street parking areas shall be provided as required by the Board of Zoning Adjustment;
[[Image here]]
“(g) Public or private schools offering general educational courses, playgrounds, parks and golf courses not operated for profit, philanthropic institutions ...
“Provided, however, that the uses described in subsections (e), (f), (g), and (h) above shall be subject to the following limitations and conditions: No permit shall be issued for any of such uses, except with the written approval of the planning commission. ...”
Also, in § 19-72, the ordinance provides for a “Recreational District,” within which nonprofit recreational uses such as playgrounds, parks, and athletic fields are permitted. According to the record, the athletic complex is situated in a “Residence A” district.

SPECIFIC CLAIMS OF RESIDENTS

1. The development of the athletic complex was unauthorized:
The residents concede that the ordinance authorizes playgrounds and parks in “Residence A” districts, but only upon written approval of the Planning Commission. The residents argue, however, that the Planning Commission abdicated its responsibilities to an ad hoc steering committee. In so doing, the residents argue, the Planning Commission violated the letter and spirit of the ordinance in not giving full consideration to development plans, especially in light of substantial revisions which followed the Planning Commission’s written approval of the “general concept” of the athletic complex.
Also, the residents contend that the athletic complex fits more properly within the parameters of § 19-72 of the ordinance as a “Recreational District.” As such, development of the athletic complex on its current location would require rezoning.
In its brief, the City argues that the Planning Commission approved the athletic complex as required in the ordinance. According to the City, the ordinance authorizes the athletic complex in “Residence A” districts and, therefore, this case involves no rezoning. The City primarily argues that the ordinance authorizes the Planning Commission to approve such a use and that the Planning Commission did just that.
The Board argues that its only involvement as to the “authorization” of the athletic complex was in leasing its property to the City. The Board concedes that it had no authority to approve use of that property as an athletic complex, but says that it did not undertake to grant any type of “approval.”
2. The actions of the City and the Board were arbitrary and capricious and violative of the residents’ due process rights:
The residents claim that the situation described in their first issue, i.e., the City’s and *717 the Board’s disregard for statutory limitations on their authority, the lack of meaningful notice provided to the residents, and the constantly changing plans of the steering committee, violated the residents’ due process rights. For this proposition, the residents cite City of Tuscaloosa v. Bryan, 505 So.2d 330 (Ala.1987), wherein our supreme court held that certain residential property owners were denied procedural due process by a city’s approval of the development of an apartment complex.
The City states that the residents’ constitutional claims are grounded in the Fifth and Fourteenth Amendments of the U.S. Constitution and, therefore, are actionable, if at all, under 42 U.S.C. § 1983. The City contends that it, as a municipality, cannot be held liable under this section pursuant to a re-spondeat superior theory. Also, the City, citing Rymer v. Douglas County, 764 F.2d 796 (11th Cir.1985), claims that the residents have not shown that the City’s actions were “substantial enough” to rise to the level of a constitutional violation. Concerning possible procedural due process violations, the City argues that § 1983 is not available to the residents when state law remedies exist.
The Board again argues that the summary judgment in its favor was appropriate as to this claim since the Board did not participate on this level. The Board states, however, that even if it was directly involved, the residents’ claims would fail because they do not rise to the level of being “substantial enough.” Rymer, supra.
3.The residents’ claims are actionable under Art. XII, § 235, of the Alabama Constitution:
Beginning with the assertion that their property rights have been affected adversely by the development of the athletic complex, the residents argue that § 235 provides a right of action. First, the residents state that § 235 extends to “injuries” as well as “takings.” Second, the residents assert that the athletic complex fits within the definition of § 235 as being either “works” or “improvements.”
The City claims that no “taking” or “injury” has occurred. Specifically, the City argues that the mere diminution of market value caused by the closeness of a public work is insufficient. The City admits that clearing occurred as close as forty feet from some of the residents’ properties, but claim that such is not enough to constitute a “taking” or “injury.”
The Board first claims that'its actions did not proximately cause any such injury to the residents. Even if there was participation on behalf of the Board, however, it argues that there was no “taking” or “injury” within the meaning of § 235. Since all claims of tort were dismissed by the trial court as to the Board, the Board’s brief concludes at this point.
4. The residents’ claims are actionable under a traditional nuisance theory:
The residents cite Ala.Code 1975, § 6-5-120, which defines “nuisance” as “anything that works hurt, inconvenience or damage to another.” The residents contend that they have suffered decreases in the values of their properties, and interruptions in the enjoyment of their properties and privacy due to, among other things, noise and excessive fighting from the athletic fields. Accordingly, the residents contend that such effects overwhelmingly support their claims for monetary and injunctive relief.
Concerning the residents’ complaints of excessive lighting from the athletic complex, the City states that such activity is permissible so long as it does not interfere substantially with the right of an adjacent property owner to enjoy his property.
5. The residents claim that there was substantial evidence of misrepresentation:
The residents claim that city officials, school board officials and/or members of the steering committee represented to them that the undeveloped part of the high school campus would remain undeveloped or would be subject to only limited development. Accordingly, the residents contend they relied on these representations by either purchasing their homes, not selling their homes when they had an opportunity, or forgoing legal action at a time when their rights could have been better preserved. As a result, the *718 residents claim to have suffered material damage.
The City argues that the residents admitted in deposition that no promises were made to them by City representatives and admitted that no type of agreement was reduced to writing. In fact, the City claims that its representatives met with the residents on numerous occasions to try and accommodate their wishes as to buffer zones. In referring to Ala.Code 1975, § 6-5-101, the City contends that there was no evidence of a present intent to deceive and, therefore, that there could be no misrepresentation.

HOLDING

After reviewing the voluminous record on appeal and considering the oral arguments of counsel, we agree with the trial court’s entry of summary judgment for the Board. The evidence revealed that the Board’s only involvement, in essence, was as owner of the property on which the athletic complex was built. As stated earlier, McClain testified that the Board approved the proposed complex merely with the stipulations that there be no cost to the Board and that the Board have priority in using the property.
Such limited involvement does not implicate the Board as to the claims of the residents and, therefore, the summary judgment in favor of the Board is proper. Accordingly, we affirm the trial court’s judgment in this respect.
Concerning the residents’ claims against the City, we note that genuine issues of material fact exist so as to defeat the City’s motion for summary judgment. In short, the record reveals disputed facts pertaining to, among other things, the plans and subsequent revisions of the athletic complex, possible representations made to the residents concerning the development of the complex, the applicability of certain provisions of the ordinance, and the role of the steering committee in relation to the Planning Commission. Also, the record contains testimony from the residents as to the detrimental effects to their properties which they say the athletic complex has produced. Basically, the record reveals genuine issues of material fact as to each of the residents’ claims against the City. Consequently, we hold that the trial court erred in entering the summary judgment for the City and we reverse as to this aspect of the trial court’s order.
Based on the foregoing, ' the summary judgment for the Board is affirmed and the summary judgment for the City is reversed. Accordingly, we remand this case for a trial on the merits of the residents’ claims against the City.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, J., concur.